```
       IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF INDIANA
                SOUTH BEND DIVISION
```

RANDALL ANDERSON,              )
                               )
Plaintiff,                     )
                               )
vs.                            )     NO. 3:12-CV-812
                               )
CAREFREE OF COLORADO,          )
                               )
Defendant.                     )

## OPINION AND ORDER

This matter is before the Court on the: (1) Motion for Summary Judgment, filed by Defendant on December 5, 2013; and (2) Amended Motion for summary Judgment, filed by Defendant on December 6, 2013. For the reasons set forth below, the motion for summary judgment (DE# 22) is **DENIED as moot** and the amended motion for summary judgment is **GRANTED**.[1] Accordingly, this case is **dismissed with prejudice**.

BACKGROUND

On December 11, 2012, Plaintiff, Randall Anderson, filed an "Employment Discrimination Complaint" against his former employer, Defendant, Carefree of Colorado (Carefree). Anderson alleged he was terminated based on his race, in violation of Title VII of the

---

[1] Carefree filed the amended motion for summary judgment to include a request that the Section 1981 claim be dismissed.

Civil Rights Act and 42 U.S.C. section 1981. Anderson also alleges Carefree violated his privacy rights under the Healthcare Insurance Portability and Accountability Act of 1996 (HIPAA).

Carefree has filed the instant motion for summary judgment, arguing that there are no genuine issues in dispute and that it is entitled to judgment as a matter of law. Because Anderson is proceeding pro se, Carefree provided Anderson with notice of its summary judgment motion (DE# 25) and a short and plain statement of the need to respond to it, giving both the text of Rule 56(c) and an explanation of the rule in plain English. *Timms v. Frank*, 953 F.2d 281, 283, 285 (7th Cir. 1992) (citing *Lewis v. Faulkner*, 689 F.2d 100, 102-03 (7th Cir. 1982). Plaintiff has had ample time in which to respond to the instant motion, but has failed to do so.[2]

DISCUSSION

Summary Judgment Standard

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not

---

[2] Instead of filing a response brief, Anderson has instead filed letters on various topics; none of which constitutes a response to the instant motion for summary judgment. (See DE##'s 27-29).

every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). A party opposing a properly supported summary judgment motion may not rely on allegations in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the non-moving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Facts

The following facts are undisputed and supported by the record. Carefree/Scott Fetzer Company d/b/a Carefree of Colorado ("Carefree") distributes awnings for the RV industry out of their Elkhart, Indiana warehouse. (Anderson Dep. at 38-39). Anderson, who is African-American, began work as a full-time material handler for Carefree on or about April 26, 2012. (Dep. of Anderson at 7, 32-37

& Exs. B-H; Declaration of Melanie Oliver ¶ 4 & Ex. B; *but see* Anderson Dep. at 97 (April 24, 2012)). Anderson's job included unloading awnings from incoming trucks and pulling and racking new orders to be placed on outgoing trucks. (Anderson Dep. at 37-38). Anderson worked primarily with two other material handlers, Otto, who is Hispanic, and Jemale, who is African American. (Anderson Dep. at 38 & Eratta sheet). He reported to the Warehouse Lead, Kelly Malicoat ("Malicoat"), a Caucasian female. (Anderson Dep. at 39-40). Malicoat reported to the facility manager, Mark Fortney ("Fortney"), a Caucasian male, who started at the facility on May 1, 2012. (Anderson Dep. at 40). In addition to the three material handlers, Anderson recalls several other employees who performed inspection work that involved the unwrapping and wiping down of incoming awnings; they also assisted in the unloading of trucks when needed. (Anderson Dep. at 41-44). These inspectors included Jonathan Vargas ("J. Vargas") and Bryan Vargas ("B. Vargas"), Hispanic males, who happened to be brothers. (Anderson Dep. at 41-42, 53).

Early in his employment, Anderson had conversations with J. Vargas during which J. Vargas questioned why Anderson would walk through the office to use a particular men's bathroom rather than use one that was closer to where Anderson normally worked; Anderson told him what bathroom he used was a personal matter. (Anderson Dep. at 44). Also early on in Anderson's employment, J. Vargas and

other inspectors would sometimes assist the material handlers in unloading trucks. (Anderson Dep. at 51). If Anderson indicated that he intended to leave the truck to go to the bathroom, J. Vargas would say to others on the truck, "[y]ou know, a nigger's always got to go to the bathroom." (Anderson Dep. at 49-50). Anderson told J. Vargas to refer to him by his name rather than calling him "nigger." (Anderson Dep. at 50). On other occasions, Anderson would walk past J. Vargas' work area on his way to the bathroom; J. Vargas would make comments to his co-workers such as "[h]ere comes that nigger going to the bathroom again" in a voice loud enough for Anderson to hear him. (Anderson Dep. at 51-52, 65-67). Sometimes Anderson would confront J. Vargas about using the word "nigger," and they would exchange words; other times he just avoided walking past him. (Anderson Dep. at 51, 53, 65-67, 310-11). Anderson also observed J. Vargas swinging awnings around his head when unloading trucks, which Anderson thought was unsafe behavior. (Anderson Dep. at 60-62).

According to Anderson, he complained about J. Vargas to the plant manager who preceded Fortney. (Anderson Dep. at 52-57). The Operations Facility Manager who preceded Fortney, Brian Lewis, left his position on or about April 3, 2012, before Anderson's employment began. (Declaration of Venita Fortune ¶ 3). There was no interim Operations Facility Manager, so Carefree is unsure to whom Anderson made this complaint. (*Id*.). According to Anderson, the

person to whom Anderson complained told Anderson he would talk to J. Vargas' supervisor; however, the individual left the facility shortly thereafter. (Anderson Dep. at 50, 52-57). Anderson does not know what, if anything, this individual did with regard to J. Vargas before he left. (Anderson Dep. at 56-57).

About a week after the individual to whom he first complained left, Anderson complained to Malicoat about J. Vargas and other inspection employees causing problems when working on the trucks. (Anderson Dep. at 57-58). He did not mention J. Vargas' use of the word "nigger." (Anderson Dep. at 57). Instead, he complained about the unsafe behavior on the trucks. (Anderson Dep. at 57-59). Malicoat responded by hiring a temporary employee, an African-American male named Bramley, to help unload trucks, eliminating the need for the inspection employees to step in and help out. (Anderson Dep. at 58-59).

At some point after this, Anderson mentioned to Malicoat that J. Vargas was using the "n" word to refer to him when he walked by the inspectors' work area to go to the bathroom. (Anderson Dep. at 65-67). Anderson believes Malicoat talked to J. Vargas and J. Vargas' supervisor about use of the word because Malicoat later told Anderson that she did not know who to believe because J. Vargas told her that Anderson had called him a "spic." (Anderson Dep. at 67-68). According to Anderson, this follow-up conversation occurred on or about Wednesday, May 16, 2012, or Thursday, May 17,

2012. (Anderson Dep. at 67-70, 72). Anderson stated that after Malicoat raised the credibility issue, he denied calling J. Vargas a spic and told Malicoat he was going to resign effective Friday, May 25, 2012. (Anderson Dep. at 67-70, 73).

On Tuesday, May 22, 2012, Mark Fortney learned from Malicoat that Anderson had complained to her about J. Vargas "messing with him." (Fortney Dec. ¶ 4). From his conversation with Malicoat, Fortney understood that J. Vargas had used inappropriate terms including the words "nigger" and "bitch" to describe Anderson, had slandered Anderson's wife, and had threatened to "get his Jersey boys." (Fortney Dec. ¶ 5). Fortney spoke with Anderson on the same date, and Anderson confirmed that J. Vargas had used the word "bitch" and "nigger" to describe him, made comments about his wife, and made other threatening comments. (Fortney Dec. ¶ 6; Anderson Dep. at 72-78).

After talking with Anderson, Fortney called Venita Fortune, then Carefree's Director of Administration, who is based in Colorado and heads Carefree's human resources function. (Fortney Dec. ¶ 7; Fortune Dec. ¶¶ 2 & 4). Fortune and Fortney agreed that they should give J. Vargas a written warning for violation of the company's anti-harassment policy and make it very clear to him that he could not behave in the way that Anderson had described. (Fortney Dec. ¶ 8; Fortune Dec. ¶ 5). Fortney called J. Vargas into his office, and, with Fortune on the phone, administered the

written warning. (Fortney Dec. ¶ 9; Fortune Dec. ¶ 6). J. Vargas signed the warning; however, he also explained that Anderson had made derogatory comments and used inappropriate language towards him, including calling him a "spic." (*Id.*).

The next day, Wednesday, May 23, 2012, Anderson was absent. (Oliver Dec. ¶ 4 & Ex. C). J. Vargas came to Fortney and said he wanted to make a complaint against Anderson. (Fortney Dec. ¶ 10). Specifically, J. Vargas reported that while he was in the office with Fortney getting his warning on the prior day, Anderson told other employees, "[n]ow that spic is going to get what he deserves." (*Id.*). J. Vargas also called Fortune and gave her more details of threatening comments from Anderson. (Fortune Dec. ¶ 8). Fortney and Fortune discussed the situation and decided to issue a written warning to Anderson like the one they had issued to J. Vargas. (Fortune Dec. ¶ 9; Fortney Dec. ¶ 11).

Fortney met with Anderson on the morning of May 24, 2012, to give him the written warning. (Fortney Dec. ¶ 12). Anderson has only a limited recollection of this meeting: he recalls Fortney telling him that J. Vargas had accused Anderson of calling him a spic; he recalls denying the allegation; and he recalls being upset about the allegation. (Anderson Dep. at 152-54, 298). He has no recollection of Fortune being on the phone during this meeting, but he admits that it was possible she was. (Anderson Dep. at 153-54). Fortune and Fortney both recall Fortune being on the phone during

the meeting. (Fortune Dec. ¶ 10 ; Fortney Dec. ¶ 12). They both also recall Anderson being very angry and vehemently denying that he had referred to J. Vargas as a spic. (Id.) Anderson did not sign a written warning at the meeting. (Fortney Dec. ¶ 12 ; Anderson Dep. at 153-54, 298).

Later on the morning of May 24, 2012, Anderson was walking out of the men's room, and B. Vargas, J. Vargas' brother, called him a snitch. (Anderson Dep. at 129-130 & Ex. K). Anderson asked what B. Vargas had said. (*Id.*) B. Vargas became defensive and threatened to beat Anderson. (*Id.*) J. Vargas told his brother not to say what he was saying. (*Id.*) Anderson asked B. Vargas why he had not made the threat when the men were in the bathroom. (*Id.*) B. Vargas said he would say it to Anderson's face. (*Id.*) J. Vargas then grabbed B. Vargas and said "let's go bro, this bitch ain't worth it." (*Id.*) Anderson said he was not a bitch. (*Id.*) J. Vargas then called Anderson a "bitch as[s] nigger." (*Id.*) According to Anderson, he immediately orally reported this incident to Fortney, and Fortney told him to write it down. (Anderson Dep. at 129-131). Fortney recalls Anderson giving him the written document late in the afternoon of May 24, 2012, after the meeting described in the next paragraph. (Fortney Dec. ¶ 15 & Ex. B).

By May 24, 2012, it appeared to Fortney and Fortune that Anderson and J. Vargas had engaged in inappropriate conduct, including racial slurs, toward each other, so they decided to bring

the two men together and attempt to try to work through the situation with both of them at once. (Fortune Dec. ¶ 11; Fortney Dec. ¶ 13). Around noon or 1:00 p.m. on May 24, 2012, Fortney called both of the men into an office at the facility. (Anderson Dep. at 80; Fortney Dec. ¶ 13). Fortune; Melanie Oliver ("Oliver"), Carefree's Human Resources Manager; and Bob Emler, Carefree's Director of Materials, called in on the phone. (Anderson Dep. at 81-84, 100-01; Fortune Dec. ¶ 11). Fortune talked to the two men, telling them that the situation between them had gotten out of hand. (Anderson Dep. at 84). Anderson recalls that J. Vargas became very angry during the meeting and blamed everything on Anderson. (Anderson Dep. at 87-89). Anderson recalls making comments himself, but he does not recall becoming angry like J. Vargas did. (Anderson Dep. at 93-94). Fortune listened to what they were saying. (Anderson Dep. at 97-98). Eventually, Fortune said they had a "he say/he say" situation, directed Fortney to tear up any previous write ups, and said that they were going to "start fresh." (Id.).

She instructed both men, in no uncertain terms, that if management caught either of them calling the other names, there would be no more questions asked, and the person doing the name calling would be terminated. (Id.) Anderson also recalls Fortune telling both of them that what had transpired in the office should stay in the office; they should not go out and talk about it. (Anderson Dep. at 100). Anderson does not recall what Melanie

-10-

Oliver said during the call. (Anderson Dep. at 100-01). Immediately after the call, Oliver typed up her impressions of what occurred during the call. (Oliver Dec. ¶ 3 & Ex A ).

After the meeting, Fortney gave each man a written Agreement and Warning to sign; J. Vargas signed his immediately. (Fortney Dec. ¶¶ 14 & 16 & Exs. A & C). Anderson recalls receiving the Agreement and Warning sometime later on the 24th and taking it home to think about it. (Anderson Dep. at 144-45).

On the morning of May 25, 2012, Anderson advised Fortney that he was not going to sign the Agreement and Warning. (Fortney Dec. ¶ 16 & Ex. C; Anderson Dep. at 141-42, 145). He had two reasons for not signing. (Anderson Dep. at 146, 149-150). Sometime during the afternoon of May 24, after the meeting with Fortune on his phone, Anderson had walked by and heard J. Vargas telling his brother that Anderson had gone in the office and "lied on him," causing management to tell him that if he said anything else to Anderson he would be fired - behavior which contradicted the directive of the meeting that neither of them talk about what happened in the meeting. (Anderson Dep. at 145-148). Second, Anderson did not sign because he did not "feel that [he] should have been in the office getting wrote up when [he] wasn't the one initiating none of the contact. [H]e was the one being abused and threatened." (Anderson Dep. at 142, 149-50).

After their short conversation, Fortney left to do the

forklift training, and Anderson walked away to use the men's room closest to the facility's office. (Anderson Dep. at 161-62). When he got there, the restroom was in use. (Adnerson Dep. at 167). So he walked to Malicoat's office, dropped off some paperwork, and then walked to the warehouse bathroom that is connected to the employee break room. (Anderson Dep. at 168-176, 184-85 & Ex. M). While Anderson was washing his face, he heard someone enter the bathroom and close the door. (Anderson Dep. at 176-77). When he looked up, B. Vargas was standing over him. (Anderson Dep. at 177). According to Anderson, B. Vargas challenged him to fight; Anderson refused; a scuffle ensued; B. Vargas pulled out a knife; Anderson pulled a box cutter out of his pocket; B. Vargas tried to stab Anderson and missed; Anderson struck B. Vargas' arm with the box cutter; B. Vargas started bleeding and ran out of the bathroom, yelling for his brother. (Anderson Dep. at 177-192). Fortney ran into the bathroom with J. Vargas right behind him. (Anderson Dep. at 192). Fortney told J. Vargas to get away and closed the bathroom door with Anderson inside. (Anderson Dep. at 192-93). Anderson opened the door, and Fortney told him to wait in the office; Fortney directed a truck driver named Dave to watch Anderson. (Anderson Dep. at 193-94). A female police officer arrived, talked to Anderson, took the box cutter from Anderson, and arrested Anderson. (Anderson Dep. at 195-96, 209). Anderson served thirty-three (33) days in jail. (Anderson Dep. 210). The prosecutor

charged Anderson with a class D felony battery; he eventually pled guilty to a class A misdemeanor battery. (Anderson Dep. at 230-33). His sentence was a year of probation with credit for time served. (Anderson Dep. at 233-36).

Carefree terminated Anderson because of the altercation with B. Vargas. (Anderson Dep. at 297). Carefree sent Anderson his final paycheck with a letter terminating his employment. (Anderson Dep. at 262-63). Carefree also notified People Link, the agency through which B. Vargas worked, that B. Vargas was not to return to work at Carefree. (Fortune Dec. ¶ 12). He has not done so. (Fortney Dec. ¶ 17). Anderson admits that B. Vargas' assignment was terminated because of the altercation. (Anderson Dep. at 298).

According to Anderson, his claim for violation of HIPAA is based on two disclosures by Malicoat. (Anderson Dep. at 306). First, he personally heard Malicoat telling J. Vargas, at some point during the week of May 21, 2012, that Anderson was quitting on May 25, 2012. (Anderson Dep. at 303-04). Second, at an unknown time Dave the truck driver asked Anderson what medicine he was taking. (Anderson Dep. at 305-06). Anderson refused to provide the information and demanded to know who told Dave that he was taking medicine. (Anderson Dep. at 305-06.) Dave used the term "she" to describe the person who told him something about Anderson's medication, but refused to tell Anderson anything else. (Anderson Dep. at 306). Anderson had previously told Malicoat that he was

taking some medication, so he assumed that Malicoat told Dave. (Anderson Dep. at 305, 307). He admits, however, that he does not know what, if anything, Malicoat (or anyone else) told Dave about Anderson taking medication. (Anderson Dep. at 307).

Scott Fetzer's self-insured benefit plans are "covered entities" for HIPAA purposes, but no one based in Indiana engages in plan administration. (Oliver Dec. ¶ 5). Malicoat was a Warehouse Lead in April and May 2102; she is not a health care provider. (Oliver Dec. ¶ 6). She does not, and did not in April or May 2012, have access to employees' health insurance claims information, and she does not, and did not in April or May 2012, transmit health-related information to, or receive such information from, insurance companies on behalf of Carefree. (*Id.*)

Anderson recalls Fortney starting somewhere between two days and a week after Anderson arrived. (Anderson Dep. at 40; 57-58). Fortney started on Tuesday, May 1, but he was out of the facility for training from Tuesday, May 8 through Friday, May 11. (Declaration of Mark Fortney ¶ 3).

<u>The Title VII and Section 1981 claims must be dismissed because there is no evidence that Carefree engaged in race discrimination</u>

Anderson alleges that he was discriminated against on the basis of his race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-5, and in violation of his equal rights under the law, 42 U.S.C. § 1981. Because Title

VII and 1981 claims are analyzed in the same manner, these claims will be addressed simultaneously. *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 337-38 (7th Cir. 2002). There are two ways a race discrimination claim can be proven. There is a direct and an indirect method. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938 (7th Cir. 2003). Even though Anderson has failed to respond to the instant motion or asserted which method he wishes to proceed on, this Court will examine whether there is a triable issue of fact under either method.

### The direct method

Under the direct method a plaintiff must "show either through direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose." *Id*. at 938-939. Direct evidence consists of either an outright admission by the decision maker that the challenged action was undertaken because of the [plaintiff's race] or a convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action. *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012)(citations and quotations omitted). There record does not demonstrate any admissions of discrimination.

Direct evidence can also be circumstantial evidence from which a trier of fact could reasonably infer that Carefree discriminated

-15-

against him because of his race. To create a convincing mosaic, a plaintiff can rely on "three different types of circumstantial evidence of intentional discrimination: (1) suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the plaintiff was qualified for the job in question but was passed over in favor of a person outside the protected class and that the employer's stated reason was a pretext for discrimination." *Id.* (citations and footnotes omitted). Ultimately, the circumstantial evidence a plaintiff presents "must point directly to a discriminatory reason for the employer's action" and be "directly related to the employment decision." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003); *Venturelli v. ARC Cmty. Services, Inc.,* 350 F.3d 592, 602 (7th Cir. 2003). In reviewing the record, none of these three types of circumstantial evidence are present. There is nothing that directly points to a discriminatory reason for Carefree terminating Anderson. Quite the contrary, the evidence shows that Carefree terminated Anderson due to the altercation that led to his arrest. Thus, there is no direct evidence that Anderson was discharged based on his race.

Indirect Method

When using the indirect method a plaintiff must first make a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To do this, the plaintiff must show that 1) he belongs to a protected class 2) he was meeting his employer's legitimate performance expectations 3) he suffered an adverse employment action and 4) other similarly situated employees who were not members of the protected class were treated more favorably. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007).

If the plaintiff is able to make out a prima facie case the burden then shifts to the defendant to make a legitimate, nondiscriminatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. 792 at 802. If the defendant meets this burden then the plaintiff is afforded a chance to show that the defendant's nondiscriminatory reason is mere pretext for discrimination. *Id.* at 804. To show pretext the plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence." *Fane*, 480 F.3d 534 at 541. While the burden does shift between the plaintiff and the defendant, the ultimate burden of persuasion is always with the plaintiff. *Id.* at 538.

There is no question that Anderson, an African-American, is a

member of a protected class. However, whether he was meeting his employer's legitimate performance expectations is another story. Anderson got into an altercation with B. Vargas in the men's room at Carefree, which resulted in Vargas being cut by a box cutter and Anderson's arrest. Anderson was fired for this incident and has pointed to no other similarly situated employee who was not a member of the protected class who was treated more favorably. Thus, Anderson is unable to make out a prima facie case of discrimination.

Even if Anderson could make out a prima facie case, Carefree has proffered a legitimate, nondiscriminatory reason for terminating Anderson - the altercation in the men's room. There has been no evidence that Carefree's stated reason is pretextual. In fact, Anderson admits that the altercation was the reason he was fired from Carefree. (Anderson Dep. pp. 297-300). As such, Anderson cannot successfully proceed under the indirect method either.

As a result, Anderson's Title VII and section 1981 claims fails.

The HIPAA claim must be dismissed

Anderson claims that Malicoat violated his HIPAA privacy rights by telling J. Vargas that Anderson was quitting and telling Dave, a truck driver, that Anderson was taking medication.

(Anderson Dep. pp. 302-04, 306). Unfortunately for Anderson, HIPAA does not provide him a cause of action against Carefree.

> HIPAA empowered the Secretary of Health and Human Services to promulgate regulations relating to privacy standards for medical information. These standards authorize the Secretary of Health and Human Services to take enforcement action against health care providers and insurers for noncompliance with the privacy standards. HIPAA, however, does not provide a private cause of action for enforcing privacy standards.

*Hamilton-Hayyim v. Jackson*, No. 12-cv-06392, 2013 WL 3944288 *9 (N.D. Ill. July 31, 2013) (citations omitted); see also *Dodd v. Jones*, 623 F.3d 563, 569 (8th Cir. 2010). Because HIPAA is a regulatory statute that does not create a private cause of action for Anderson to bring an action against Carefree, this claim must be dismissed.[3]

CONCLUSION

For the reasons set forth above, the motion for summary judgment (DE# 22) is **DENIED as moot** and the amended motion for summary judgment is **GRANTED**. Accordingly, this case is **dismissed with prejudice**.

**DATED:  June 2, 2014**          /s/RUDY LOZANO, Judge
                                  **United States District Court**

---

[3] Even if HIPAA did create a private cause of action, Anderson's claim would still fail because it is based on nothing more than Anderson's speculation and hearsay – neither of which can support a claim. There is no evidence that Carefree violated any HIPAA regulation.

-19-